IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-01706-PAB-MJW
    (Consolidated with Civil Action No. 12-cv-02445-PAB-MJW)

---

Civil Action No. 12-cv-01706-PAB-MJW
MEDTRONIC NAVIGATION, INC., a Delaware Corporation,

    Plaintiff,

v.

SAINT LOUIS UNIVERSITY, a Missouri benevolent corporation,

    Defendant.

---

Civil Action No. 12-cv-02445-PAB-MJW
SAINT LOUIS UNIVERSITY, a Missouri benevolent corporation,

    Plaintiff,

v.

MEDTRONIC NAVIGATION, INC., a Delaware Corporation, and
MEDTRONIC SOFAMOR DANEK, INC., an Indiana Corporation,

    Defendants.

---

**ORDER**

---

    This matter is before the Court on Defendant Medtronic Sofamor Danek, Inc.'s

Motion to Dismiss [Docket No. 44] filed on February 19, 2013 in Case No. 12-cv-02445-

PAB-MJW.  Defendant Medtronic Navigation, Inc. ("Medtronic") is a Delaware

corporation with its principal place of business in Colorado.  Docket No. 40 at 1, ¶ 2.

Medtronic Sofamor Danek, Inc. ("Sofamor Danek") is an Indiana corporation with its

principal place of business in Tennessee and is the parent company of Medtronic.

Docket No. 40 at 2, ¶ 3.  This case concerns the allegations of plaintiff Saint Louis

University ("SLU") arising out of the alleged breach of a licensing agreement for medical

technology. Sofamor Danek moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss SLU's claims for tortious interference with contract, unjust enrichment, fraud, and piercing the corporate veil and moves under Rule 12(b)(1) to dismiss SLU's claim for a declaratory judgment.

## I. STANDARD OF REVIEW

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When resolving a facial attack on the allegations of subject matter jurisdiction, the Court "must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). To the extent the defendant attacks the factual basis for subject matter jurisdiction, the Court "may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *SK Finance SA v. La Plata Cnty.*, 126 F.3d 1272, 1275 (10th Cir. 1997). "Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment in such circumstances." *Id*. Ultimately, and in either case, plaintiff has "[t]he burden of establishing subject matter jurisdiction"

2

because it is "the party asserting jurisdiction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim. FED. R. CIV. P. 12(b)(6); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted). At the same time, however, a court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are

3

somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

"[I]n general, a motion to dismiss should be converted to a summary judgment motion if a party submits, and the district court considers, materials outside the pleadings." *Prager v. LaFaver*, 180 F.3d 1185, 1188 (10th Cir. 1999); FED. R. CIV. P. 12(d). However, a court may properly consider facts subject to judicial notice, state court pleadings, and matters of public record without converting a motion to dismiss into a motion for summary judgment. *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008). In addition, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff"s claim and the parties do not dispute the documents' authenticity." *Alvarado*, 493 F.3d at 1215.

## II. BACKGROUND

The following facts are drawn from the second amended complaint and, for the purpose of ruling on Sofamor Danek's motion to dismiss, assumed to be true.[1] In March 1994, SLU entered into a licensing agreement with Stealth Technologies, Inc. ("Stealth"), a predecessor of Medtronic Navigation.[2] Docket No. 40 at 2, ¶ 8. Pursuant

---

[1] Since Sofamor Danek does not "go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests," *see Nudell*, 363 F.3d at 1074, there is no need to depart from the presumption that the facts alleged are true.

[2] At the time the licensing agreement was executed, Medtronic was doing business as Stealth Technologies, Inc. ("Stealth"). Stealth changed its name to Surgical Navigation Technologies, Inc. ("SNT") in March 1995, and was subsequently acquired by Sofamor Danek Group, Inc. ("SDG"). SDG was then acquired by Medtronic, Inc., which then changed its name to Medtronic Sofamor Danek, Inc. SNT

to the licensing agreement, Stealth was required to pay SLU a royalty of 2% on net sales of licensed products sold by Stealth or its sublicensees.  Docket No. 40 at 2, ¶ 9. The licensing agreement required Stealth to deliver a copy of each sublicensing agreement to SLU within thirty days of execution.  Docket No. 40 at 3, ¶ 12.  On February 28, 1995, SLU and Stealth amended the licensing agreement to increase the royalty payment to 2.33% of net sales and to permit Stealth to transfer its rights and obligations under the licensing agreement to Surgical Navigation Technologies, Inc. ("SNT"), also a predecessor of Medtronic Navigation.  Docket No. 40 at 3, ¶¶ 14-16.

In June 1995, SNT began selling licensed products and, in October 1995, it began making royalty payments to SLU.  Docket No. 40 at 4, ¶¶ 23-24.  The royalty statements indicated that a 2.33% royalty was being paid to SLU on "net sales" of licensed products.  Docket No. 40 at 4, ¶ 25.  From 1998 through 2006, the royalty statements stated that a royalty of 2.33% was being paid on the "Extended SNT Sale Price."  Docket No. 40 at 4, ¶ 28.

In June 2006, SLU hired Pricewaterhouse Coopers LLP ("PwC") to audit Medtronic's royalty payments.  Docket No. 40 at 4, ¶ 29.  In conducting its fieldwork, PwC "learned that Medtronic had been calculating royalties under the Agreement at 2.33% of a transfer price agreed upon between Medtronic and Medtronic Sofamor Danek, rather than the much higher Net Selling Price invoiced to customers."  Docket No. 40 at 5, ¶ 30.  "PwC calculated that royalties were underpaid during that time in the

---

changed its name to Medtronic Navigation, Inc. in January 2005.  Docket No. 40 at 3-4, ¶¶ 17-22.  One of the issues in dispute is whether Sofamor Danek is a party to the licensing agreement with SLU.  *See* Docket No. 44 at 2-3.

amount of $1,200,558."  Docket No. 40 at 5, ¶ 31.  The PwC audit was not completed because Medtronic withheld necessary documents, but "this information would have revealed further deficiencies in Medtronic's royalty payments."[3]  Docket No. 40 at 5, ¶¶ 32-35.

In February 2007, SLU's representatives corresponded with John Thompson, in-house counsel for Medtronic, "who indicated that certain transfer/distribution agreements between Medtronic Navigation and Medtronic Sofamor Danek controlled the basis upon which royalties were calculated."  Docket No. 40 at 5, ¶ 36.  Mr. Thompson provided SLU "two severely redacted agreements between SNT and two different Sofamor Danek entities."  Docket No. 40 at 6, ¶ 37.  These agreements were an Exclusive License Agreement between SNT and Sofamor Danek Properties, Inc. and a Manufacturing Agreement between SNT and Danek Medical, Inc.  Docket No. 40 at 6, ¶¶ 38-39.  The redactions obscured "the majority of the material terms of the agreements, such that SLU was unable to comprehend or analyze the agreements or their terms."  Docket No. 40 at 6, ¶ 41.

The Exclusive License Agreement and the Manufacturing Agreement arose out of Sofamor Danek's purchase of SNT.  Docket No. 40 at 8, ¶ 61.  At the time of the purchase, the two entities entered into an "earnout" agreement whereby Sofamor Danek agreed to make future payments to former shareholders of SNT contingent on SNT generating certain levels of revenue and earnings on sales of the licensed

---

[3] Under the terms of the licensing agreement, Medtronic is also responsible for the $82,121 that the audit cost, since the audit uncovered a discrepancy greater than five percent between royalties owed and royalties paid.  Docket No. 40 at 3, 5, ¶¶ 13, 35.

products.  Docket No. 40 at 8, ¶¶ 53-54.  In order to ensure that SNT would meet its targets, the former SNT shareholders negotiated with Sofamor Danek to artificially reduce the royalty payments that SNT was required to make pursuant to the licensing agreement.  Docket No. 40 at 8, ¶ 60.  These negotiations resulted in the Exclusive License Agreement and the Manufacturing Agreement between SNT and Sofamor Danek.  Docket No. 40 at 8, ¶ 61.  These agreements were not provided to SLU, in violation of the licensing agreement.  Docket No. 40 at 9, ¶ 63.  However, Sofamor Danek was in possession of the licensing agreement, and aware of its terms, when it entered into these side agreements with SNT and its former shareholders.  Docket No. 40 at 6-7, ¶¶ 45-49.

In August 2007, Medtronic altered its royalty reports to state that royalties were being calculated based on "total sales."  Docket No. 40 at 10, ¶¶ 74-75.  However, SLU determined upon further analysis that Medtronic was actually using a lower internal transfer price to calculate royalties instead of the external sale price.  Docket No. 40 at 10, ¶ 78.  SLU estimates that royalty underpayments between 2002 and 2013 totaled over $7 million.  Docket No. 40 at 11, ¶ 85.

In January 2011, Medtronic, Sofamor Danek, and SLU entered into a tolling agreement, which expired on June 30, 2012.  Docket No. 40 at 11, ¶ 84.  The tolling agreement provided that the parties would not undertake legal action against one another during the term of the agreement.  Docket No. 1-6 at 79, ¶ 1.  During the course of settlement negotiations, SLU learned that Medtronic had failed to pay royalties entirely on additional licensed products, including a product called the O-Arm Tracker.  Docket No. 40 at 12, ¶¶ 88-89.

7

On June 22, 2012, before the tolling agreement expired, Saint Louis University ("SLU") filed this case in the Eastern District of Missouri against Medtronic and Sofamor Danek.  Docket No. 1.  In its second amended complaint, SLU asserts claims for breach of contract (against Medtronic only), tortious interference with contract (against Sofamor Danek only), unjust enrichment, and fraud.  Docket No. 40 at 12, 17.  In addition, SLU alleges that Sofamor Danek abused its corporate form by causing Medtronic to breach the licensing agreement, undercapitalizing Medtronic, underpaying royalties, and concealing its side agreements from SLU, and, based on these allegations, seeks to pierce the corporate veil between Medtronic and Sofamor Danek.  Docket No. 40 at 14-15, ¶¶ 101(A)-(G).  SLU also seeks a declaratory judgment that the use of an internal transfer price breaches the licensing agreement; SLU is entitled to royalties at a rate of 2.33% on sales by sublicensees; SLU is entitled to copies of sublicensing agreements; the O-Arm Tracker is a licensed product; and SLU is entitled to an accounting from Medtronic and Sofamor Danek.  Docket No. 40 at 15-16, ¶¶ 108(A)-(F).

On September 13, 2012, this case was transferred from the Eastern District of Missouri to this Court.  Docket No. 1-14.  The Eastern District of Missouri reasoned that the first-filed rule did not apply because SLU breached the tolling agreement by filing suit before June 30, 2012.  Docket No. 1-14 at 8.  The court then determined that Colorado would be a more convenient forum because most of the witnesses reside here.  *Id*.  On February 19, 2013, Sofamor Danek filed the instant motion to dismiss. Docket No. 44.  On February 26, 2013, the Court consolidated this case with the June 30, 2012 case that Medtronic brought in this Court against SLU for breach of the tolling

agreement, breach of the licensing agreement, unjust enrichment, and conversion. *Medtronic Navigation, Inc. v. Saint Louis Univ.*, 12-cv-1706-PAB-MJW, Docket No. 1 at 12-16.

## III. DISCUSSION

### A.  Statute of Limitations

Sofamor Danek argues that Colorado law applies to this case and that the applicable two- or three-year statutes of limitations bar SLU's claims for tortious interference with contract, fraud, and unjust enrichment.  Docket No. 44 at 7-11. Sofamor Danek argues in the alternative that, even under Missouri's five-year statute of limitations, these claims are still barred because they accrued in February 2007, at the latest.  Docket No. 44 at 9-11.  SLU contends that Missouri law applies and that its claims did not accrue until August 2007.  Docket No. 52 at 11.  It also argues that the date on which its claims accrued is a disputed issue of fact that is not amenable to resolution on Sofamor Danek's motion to dismiss.  Docket No. 52 at 12-13.

### 1.  *Choice of Law*

Sofamor Danek argues that the Court should follow the general rule that a court sitting in diversity applies the law of its home state because applying Missouri law would "reward" SLU for breaching the tolling agreement.  Docket No. 44 at 8-9.  It further argues that Missouri's "borrowing statute," *see* Mo. Rev. Stat. § 516.190, requires application of Colorado law because SLU's claims originated here.  Docket No. 44 at 9. SLU responds that, under § 1404, the Court is obligated to apply Missouri's conflict-of-law provisions to this dispute.  Docket No. 52 at 7-8.  SLU further argues that the

Missouri statutes of limitations apply here because they are procedural and not substantive.  Docket No. 52 at 8.  Finally, SLU argues that the borrowing statute does not apply because the claims originated in Saint Louis, where SLU is located and where it suffered injury.  Docket No. 52 at 8-9.

"The rule is settled that when a district court grants a venue change pursuant to 28 U.S.C. § 1404, the transferee court is obligated to apply the law of the state in which the transferor court sits."  *Yoder v. Honeywell Inc.*, 104 F.3d 1215, 1219 (10th Cir. 1997) (quoting *Benne v. Int'l Bus. Mach. Corp.*, 87 F.3d 419, 423 (10th Cir. 1996)).  This Court, therefore, is bound by Tenth Circuit precedent to apply Missouri choice-of-law provisions which, in turn, require the application of the Missouri statute of limitations.  "Missouri, the forum, considers statutes of limitations issues procedural, and, therefore, governed by Missouri law."  *Renfroe v. Eli Lilly & Co.*, 686 F.2d 642, 646 (8th Cir. 1982).  In breach-of-contract cases for failure to pay, "the cause of action accrues where payment was to be made."  *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 992 (8th Cir. 2007) (listing cases).  Under Missouri law, the cause of action arose in Missouri, which is where SLU is located, where "payment was to be made" on the contract, and where SLU discovered the alleged breach.  *See Great Plains Trust*, 492 F.3d at 992.  Sofamor Danek does not provide any support for its contention that the Court may decline to apply Missouri law because of SLU's breach of the tolling agreement.  *See* Docket No. 44 at 8.

### 2.  *Application of Missouri Statute of Limitations*

Sofamor Danek argues that SLU's claims are barred, even under Missouri's five-

year statute of limitations, because SLU was aware of the underlying facts supporting the alleged claim of breach by February 2007, at the latest.  Docket No. 44 at 10-11. SLU argues that the time of its discovery is a disputed issue of fact, unripe for disposition at this time.  Docket No. 52 at 5-7.

In Missouri, the statutes of limitations for fraud, unjust enrichment, and tortious interference with contract are five years.  Mo. Rev. Stat. §§ 516.120(1), (5); *McClain ex rel. Rutledge v. Carpio*, 338 S.W.3d 361, 372 (Mo. App. 2011) (five-year statute of limitations applies to claim for unjust enrichment).  As the statute of limitations is an affirmative defense, it "is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense."  *Jessie v. Potter*, 516 F.3d 709, 713 n.2 (8th Cir. 2008).  In general, a claim accrues when the damages have been sustained and are capable of ascertainment.  *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364, 367 (8th Cir. 2011).  This point is reached "when the evidence [is] such to place a reasonably prudent person on notice of a potentially actionable injury," which may occur before the potential plaintiff becomes subjectively "aware that he suffered damages and that they were caused by the actions of the individuals in question."  *Powel v. Chaminade College Prep., Inc.*, 197 S.W.3d 576, 581, 583 (Mo. 2006) (internal citation omitted).  "[T]he mere existence of the wrong and some nominal damage is not enough. Plaintiff must also have notice of these facts or of something that puts plaintiff on notice to inquire further."  *Id*. at 584.  A claim for fraud does not accrue "until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud." *Schwartz v. Lawson*, 797 S.W.2d 828, 832 (Mo. App. 1990) (citing Mo. Rev. Stat.

§ 516.120(5)).  "Where the means for discovery exist, a plaintiff is deemed to know of the fraud, so that the period of limitations commences to run then."  *Id*.

In *Joyce*, the Eighth Circuit considered the accrual of a claim for breach of fiduciary duty against a law firm that represented plaintiff James Joyce and counseled him to enter into in several agreements that were injurious to his interests without informing him that it was not representing him in the context of those specific agreements.  635 F.3d at 366.  The law firm argued that Mr. Joyce's claim accrued at the time he signed the agreements because "their effect . . . could be gleaned from the agreements' obvious language and would therefore be ascertainable to a reasonably prudent person upon the signing of such agreements."  *Id*. at 367.  The Eighth Circuit disagreed, finding that, in order for the claim to accrue, Mr. Joyce had to be aware that "the effect of the agreements would give rise to a potentially actionable injury."  *Id*. at 368.  Since Mr. Joyce pled in his complaint that the law firm specifically told him at the signing that he would not be injured, the court found that he was not on notice of the potential future injury.  *Id*.

Sofamor Danek offers several pieces of evidence in support of its argument that the statute of limitations began running prior to June 22, 2007.  Docket No. 44 at 9-11. SLU argues that the Court may not consider this evidence on a 12(b)(6) motion and that, even if the evidence were subject to consideration, the date on which its claims accrued remains a question of fact.  Docket No. 52 at 11-12.

First, Sofamor Danek offers a royalty report from July 1996.  Docket No. 45-1. The complaint refers to royalty reports made in 1996, Docket No. 40 at 4, ¶ 26,  the

allegation that the royalty reports concealed the actual formula being used to calculate royalties is central to SLU's claim, and SLU does not dispute the authenticity of this document.  *See* Docket No. 52 at 5.  Accordingly, the Court may consider this report. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).  The report contains a table with the following headings: Item #, QTY, Cost, Intercompany Royalty, Ext Cost, and 2.33% Royalty.  Docket No. 45-1.  Basic arithmetic indicates that the royalty is calculated based on the Ext Cost figure.  The document contains no indication of what the table headings mean.

Second, Sofamor Danek offers an email from attorney Frank Agovino, acting at the time as counsel for both SLU and Medtronic, and Mr. Thompson, Medtronic's in-house counsel.  Docket No. 45-2.  Again, this correspondence is referred to in the complaint, Docket No. 40 at 5, ¶ 36, is central to the question of how SLU discovered the allegedly fraudulent payment system, and SLU does not dispute its authenticity. *See* Docket No. 52 at 5.  The email states, in pertinent part:

> As I understand the situation from our phone conference, you indicated that the fixed fee used to calculate the net selling price is specified by a transfer/distribution agreement between Medtronic Navigation and Medtronic Sofamor Danek. . . . In particular, the royalty is based on the fixed transfer price that Medtronic Navigation receives from Medtronic Sofamor Danek for the licensed products.

Docket No. 45-2.  The email is copied to two persons with email addresses at "slu.edu." *Id*.

Third, Sofamor Danek offers an exhibit filed on November 14, 2005 in *Medtronic Navigation, Inc. v. BrainLAB Medinzinische Computersystems Gmbh*, a case in which both SLU and Medtronic were parties.  *See* Docket No. 518, Case No. 98-cv-01072-

RPM-OES (D. Colo. Nov. 14, 2005).  Since the filing is public and subject to judicial notice, the Court may consider it.  *See Pace*, 519 F.3d at 1072.  The exhibit contains a declaration from a Medtronic employee, stating that "[o]n March 1, 1995, SNT granted exclusive rights, limited to a particular field of use, to Sofamor Danek Properties, Inc., as well as its affiliates including Sofamor Danek Group, Inc."  Docket No. 44-6 at 9, ¶ 13.  The Exclusive License Agreement is also attached as an exhibit.  Docket No. 44-6 at 11-24.

The Court finds that none of these documents, by themselves, caused SLU's claims to accrue.  The royalty report does not establish that SLU had notice of its potential claims prior to August 2007 because the report contains no information regarding the meaning of the headings.  *See* Docket No. 45-1.  Without knowing the meaning of the abbreviations and terminology used, there is no way to infer that the royalty basis was the internal transfer price and not the external sale price.

The email from Mr. Agovino is likewise insufficient as it lacks information regarding the identities of the sender and the recipients and their relationships to the parties.  For example, SLU asserts that Mr. Agovino was representing both SLU and Medtronic at the time, and thus that his knowledge cannot be automatically imputed to SLU.  Docket No. 52 at 6.  Medtronic counters that this fact is overcome by the presence of two other recipients with "@slu.edu" email addresses.  Docket No. 53 at 6. However, there is no information regarding the identities of the other recipients or their positions at SLU and thus it is not possible to conclusively attribute their receipt of this email to SLU.  In addition, the email does not demonstrate knowledge that the internal transfer price was necessarily lower than the external sale price.  *See* Docket No. 45-2.

14

Accordingly, this email does not demonstrate that SLU had "notice of a potentially actionable injury" prior to August 2007.  *See Powel*, 197 S.W.3d at 582.

Finally, the court filing is insufficient absent additional information regarding the circumstances of the litigation.  SLU was one of six plaintiffs and the court filing does not establish SLU's level of involvement in the litigation or how that document was relevant to SLU in such litigation, each of which is relevant to the extent it caused SLU's claims to accrue.

In sum, SLU's complaint does not establish that the statute of limitations has run on its claims against Sofamor Danek for fraud, unjust enrichment, or tortious interference with contract.

### B.  Declaratory Judgment

Sofamor Danek argues that the Court lacks subject matter jurisdiction over SLU's claim for a declaratory judgment because SLU did not mention or assert a claim against Sofamor Danek prior to filing its complaint.  Docket No. 44 at 11.  SLU counters that there is no such requirement and that the allegations in the complaint evidence a justiciable controversy.  Docket No. 52 at 13.

Under the Declaratory Judgment Act, *see* 28 U.S.C. § 2201(a), Article III courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," so long as there is a "case of actual controversy."  This requirement has been interpreted to mean that there is a "definite and concrete" dispute "touching the legal relations of parties having adverse legal interests" that is "real and substantial," admitting "of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the

15

law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300

U.S. 227, 240-41 (1937).

In *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 134 (2007), the Supreme

Court held that a patent licensee was not required to terminate or breach its licensing

agreement before asserting a claim for a declaratory judgment of invalidity against the

patent licensor.  "The rule that a plaintiff must destroy a large building, bet the farm, or

(as here) risk treble damages and the loss of 80 percent of its business before seeking

a declaration of its actively contested legal rights finds no support in Article III."  *Id*.

Here, SLU requests that the Court declare the following:

A.      The use of an inter- or intra-company transfer price to calculate
        royalties for the manufacture, use or sale of Licensed Products is not
        permitted under the Agreement and is in breach of same;

B.      SLU is entitled to all royalties on net sales of Licensed Products
        made, used or sold by or on behalf of any sublicensees of the license
        granted in the Agreement;

C.      The 2.33% royalty applies to the Net Selling Price on all sales by
        sublicensees;

D.      SLU is entitled to copies of any sublicenses of the license granted in
        the Agreement;

E.      The O-Arm Tracker is a Licensed Product; and

F.      SLU is entitled to an accounting from Defendants Medtronic and
        Sofamor Danek.

Docket No. 40 at 15-16, ¶¶ 108(A)-(F).

The declaration that SLU requests would directly affect the legal relations

between the parties as it would specify their rights and obligations under the licensing

agreement, as well as determine whether and to what extent Sofamor Danek is liable

16

on SLU's tort claims.  *See Aetna*, 300 U.S. at 240-41.  SLU is not asking the Court to

rule upon a hypothetical state of facts but rather to resolve a dispute regarding the

meaning of a contract currently in force.  For example, a finding that the 2.33% royalty

applies to sales by sublicensees would affect Sofamor Danek's obligation, as a

sublicensee under the Exclusive License Agreement, to pay such royalties.  Under

*MedImmune*, the Court has jurisdiction over the instant conflict regarding the meaning

of the licensing agreement, the amount of royalties currently owed to SLU, and the

status of the O-Arm Tracker.  *See* 549 U.S. at 134.  Sofamor Danek's argument that

this conflict is illusory because no formal mention of it was made prior to the filing of the

lawsuit, Docket No. 53 at 8, is unsupported and unavailing.

### C.  Piercing the Corporate Veil

Sofamor Danek argues that SLU has failed to state a claim for piercing the

corporate veil because it has not alleged facts showing that Medtronic and Sofamor

Danek operated as a single economic entity and has not alleged facts showing that

Medtronic is a sham corporation.  Docket No. 44 at 13-15.

A request to pierce the corporate veil is governed by the law of the defendant

company's state of incorporation.  Restatement (Second) of Conflicts § 307 (1971); *see

also* Charles Alan Wright et al., 7 Fed. Prac. & Proc. Civ. § 1826 (3d ed.) ("Under

prevailing conflicts principles, state law typically will direct that a plaintiff's status be

tested by the law of the corporation's state of incorporation.").  Sofamor Danek is

incorporated in Delaware.  "Delaware law permits a court to pierce the corporate veil of

a company where there is fraud or where it is in fact a mere instrumentality or alter ego

of its owner." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (internal citation and alterations omitted).  To prevail on an alter ego claim, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." *Id.* (internal citations and alterations omitted).

Under the first prong of the test, the degree of influence required of the parent company over the child company is "exclusive domination and control . . . to the point that [the child company] no longer has legal or independent significance of its own." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (internal citation and alterations omitted).  To determine whether this standard has been met, courts consider "factors which reveal how the corporation operates . . .[, including] whether the corporation was adequately capitalized . . .; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed;. . . and whether . . .  the corporation simply functioned as a facade for the dominant shareholder." *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003).

The second prong requires a showing of fraud or injustice inherent "in the defendants' use of the corporate form." *Foxmeyer*, 290 B.R. at 236.  Any breach of contract or tort is "in some sense, an injustice.  Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989).  "The underlying cause of

18

action, at least by itself, does not supply the necessary fraud or injustice.  To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping."  *Foxmeyer*, 290 B.R. at 236 (internal citations and alterations omitted).

SLU's veil-piercing claim is based on allegations that Sofamor Danek

A.    Caus[ed] Medtronic to enter into agreements with Sofamor Danek that, unknown to SLU, fraudulently altered the basis for the royalty payments owed to SLU under the Agreement between SLU and, at least nominally, Medtronic;

B.    Assum[ed] full responsibility for paying royalties under the Agreement, strongly suggesting that Medtronic may be undercapitalized and unable to satisfy its own financial obligations, and then underpa[id] those royalties based on the fraudulent change to the royalty calculation;

C.    [U]nderpa[id] the royalties owed to SLU, causing Medtronic, as the nominal contracting party, to breach its contractual obligations to SLU under the Agreement;

D.    Actively conceal[ed] from SLU the existence of its secret side agreements with Medtronic;

E.    Enter[ed] into an additional secret side agreement with Medtronic's founders that incentivized them to conceal their knowledge of Sofamor Danek's underpayment of royalties and dominion and control over Medtronic, through the promise of direct payments to Medtronic's founders contingent on Medtronic's generation of certain revenues from the Licensed Products—revenues, and accordingly direct payments, that increased as a direct result of the underpayment of royalties to SLU;

F.    Actively conceal[ed] from SLU the existence of its secret side agreement with Medtronic's founders;

G.    T[ook] these actions with the purpose of evading the terms of the Agreement and unlawfully retaining for itself profits from the Licensed Products that rightfully belong to SLU.

Docket No. 40 at 14-15, ¶¶ 101(A)-(G).

While SLU's allegations that Sofamor Danek caused Medtronic to enter into

19

certain agreements, assumed responsibility for the royalty payments, and failed to provide it with sufficient capital may suggest that Sofamor Danek exerted some undue influence on Medtronic, they do not establish "exclusive domination and control . . . to the point that [Medtronic] no longer has legal or independent significance of its own." *Wallace*, 752 A.2d at 1183-84.  SLU does not make any allegations regarding most of the relevant factors, such as day-to-day management of Medtronic, overlap of officers and directors, or adherence to corporate formalities.  *See Foxmeyer*, 290 B.R. at 235. Furthermore, with respect to the presence of fraud or injustice, SLU's allegations are inseparable from its underlying claim, namely, that Sofamor Danek tortiously interfered with the contract between Medtronic and SLU and unjustly enriched itself thereby. However, the underlying cause of action is, on its own, insufficient to establish the requisite injustice.  *See Mobil Oil*, 718 F. Supp. at 268.  Accordingly, permitting this claim to advance would sanction bootstrapping.  *See Foxmeyer*, 290 B.R. at 236. Thus, the Court finds that SLU has failed to state a claim for piercing the corporate veil.

### IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Medtronic Sofamor Danek, Inc.'s Motion to Dismiss

[Docket No. 44] is GRANTED in part and DENIED in part.  It is granted with respect to

plaintiff Saint Louis University's claim for piercing the corporate veil.  It is denied in all

other respects.

DATED September 23, 2013.

BY THE COURT:


 s/Philip A. Brimmer                                          
PHILIP A. BRIMMER
United States District Judge